UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | |
|---|---|
| MATTHEW MACH, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 2: 24-098-DCR |
| ) | |
| V. ) | |
| ) | |
| MERRICK GARLAND, et al., ) | **MEMORANDUM OPINION** |
| ) | **AND ORDER** |
| Defendants. ) | |

\*\*\*    \*\*\*    \*\*\*    \*\*\*

Defendants Merrick Garland, Christopher Wray, Steven Dettelbach, and the United States filed a Joint Motion to Dismiss Plaintiff Matthew Mach's Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. [Record No. 18] Having reviewed the record and the parties' arguments, the Court is satisfied that the plaintiff states a claim for an illegal firearm denial (pursuant to 18 U.S.C. § 925A and 28 C.F.R. § 25.10) and for as applied challenges under the Second and Fifth Amendments. The plaintiff, however, fails to state cognizable claims under the Privacy Act. As a result, those claims will be dismissed.

**I. Background**

Plaintiff Matthew Mach sought mental health treatment at St. Mary's Medical Center ("St. Mary's), in July 2017, six weeks after the sudden loss of his grandfather who played an instrumental role in his upbringing. [Record Nos. 12-1 at 9] Soon after his grandfather's passing, Mach began seeing a therapist and was prescribed antidepressants. However, there was no improvement of his depressive symptoms. *Id.* In addition to grieving, Mach was

reeling from a "stern talking to" by someone he respected, was binge drinking two-to-three times a week, and experiencing difficulties with a romantic relationship.  *Id.* at 8–10.

While working as a security officer, Mach took about 50 Advil "hoping they would kill" him because he "wanted to stop being a disappointment."  *Id.* at 8.  He later drank alcohol "because he wanted to die drunk," which resulted in a .17 Blood Alcohol Content upon admission to St. Mary's.  *Id.* at 8, 10.  During intake, Mach was "not agreeable to inpatient [treatment]," "would not commit to safety," and indicated that he did not "know what would happen if he went home."  *Id.* at 2.

The following day, however, Mach reported that he was not currently suicidal but had "been experiencing suicidal thoughts with increasing frequency" over the last couple of months.  *Id.* at 7.  After his mother and sister came to visit him at St. Mary's, he indicated that he felt "a little better" but that his suicidal ideations were impulsive.  *Id.* at 8.  The licensed psychologist evaluating Mach noted that he "was willing to have inpatient treatment," but she could not find a voluntary bed that accepted his insurance.  *Id.* at 11.  As a result, she initiated Probable Cause for Involuntary Hospitalization proceedings pursuant to W.V. Code § 27-5-3 so that Mach could receive further evaluation and treatment covered by insurance.  *See id.* at 11–15.

Later that day, the Circuit Court of Cabell County held a hearing and entered an order finding probable cause for Mach's involuntary hospitalization, indicating "[r]espondent is having suicidal ideation with a plan."  *Id.* at 19.  Mach was represented by appointed counsel during the hearing but not present himself.  [Record Nos. 12 at 18, 22–23 and 8 at ¶ 16]  The licensed psychologist who evaluated Mach was the only person to provide testimony.  [Record No. 12-1 at 18]

Mach was then transported to Highlands Hospital where he received evaluation and treatment for about a week before being discharged. [Record No. 8 at ¶ 14] After Mach's release, no final or formal commitment proceedings were instituted against him, as provided in W.V. Code §27-5-4, and the involuntary hospitalization legal proceedings were dismissed a few months later. *Id.* at ¶¶ 15–16. Mach continued mental health therapy through the end of 2017 on an as needed basis. *Id.* at ¶ 21.

Mach attempted to purchase a firearm to use in his home for self-protection on January 26, 2024, but was denied following a National Instant Criminal Background Check System ("NICS") inquiry. *Id.* at ¶¶ 24–27. He appealed and sought reasons for this denial by providing his transaction number and submitting a "Request for or Challenge the reason(s) for Firearm-Related Denial" about five days later. *Id.* at ¶ 28. The Department of Justice responded on February 1, 2024, stating that the Federal Bureau of Investigation's "Criminal Justice Information Services Division does not provide the reasons for delays/denials or process challenges regarding *permits* issued by state or local agencies [using] NICS." (Emphasis added). [Record Nos. 1-7 at 2 and 8 at ¶ 29] Mach again attempted to appeal the denial in early June, this time clarifying that it was for a firearm *purchase*, not *permit*. [Record No. 8 at ¶ 31] In that subsequent request, he also sought to have his records corrected pursuant to the Privacy Act, 5 U.S.C.A. § 552a. *Id.* 8 at ¶ 31. The DOJ, through the NICS section, responded that they had purged the record of his denial because more than 88 days had passed, which exceeded their retention requirement. [Record Nos. 1-7 at 2 and 8 at ¶ 29]

Mach poses no present threat to himself or others, has no current mental illness, and stopped drinking alcohol in 2019. [Record No. 8 at ¶ 22–23] And any mental health concerns he had were fully resolved in 2017. *Id.* at ¶ 22. Mach desires to purchase a firearm and believes

that he is legally eligible to do so; however, he cannot complete a purchase due to the NICS denial and fears of potential prosecution. *Id.* at ¶ 34–35, 37.

Mach filed this matter, asserting claims against Defendants Merrick Garland, United States Attorney General; Christopher Wray, Director of the Federal Bureau of Investigation; Steven Dettelbach, Director of the Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives; and the United States, as a sovereign. [Record No. 8] He alleges: (1) an illegal firearm denial under 18 U.S.C. § 925A and 28 C.F.R. § 25.10 (Count I); (2) as applied challenges under the Second and Fifth Amendments (Count II); and (3) Privacy Act violations in 5 U.S.C.A. § 552a (Count III). The defendants filed a Joint Motion to Dismiss all counts, and the motion has been fully briefed.

## II. Legal Standard

For a plaintiff to survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible upon its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While the Court need not accept legal conclusions or unwarranted factual inferences, the allegations in the complaint must be accepted as true and all reasonable inferences must be construed in the plaintiff's favor. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). However, the Court will dismiss a complaint if the factual allegations are insufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Courts are generally limited to considering the pleadings, but they may consider certain items without converting the motion to one for summary judgment such as public records, exhibits attached to the complaint, and those attached to the motion to dismiss

"so long as they are referred to in the complaint and are central to the claims contained therein." *Bassett*, 528 F.3d at 430.

### III. Analysis

### 18 U.S.C. § 922(g)(4)

The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *D.C. v. Heller*, 554 U.S. 570, 592 (2008). That right, however, is not unlimited. *United States v. Rahimi*, 602 U.S. 680, 690 (2024) (citing *Heller*, 554 U.S. 570 at 626). For example, 18 U.S.C. § 922(g)(4) prohibits the transfer of a firearm to anyone who was "(1) adjudicated as a mental defective; or (2) committed to a mental institution." "Adjudicated as a mental defective" is further defined in the Federal Firearm Regulations, 18 U.S.C. Chapter 44, as:

> (a) A determination by a court, board, commission, or other lawful authority that a person, as a result of marked subnormal intelligence, or mental illness, incompetency, condition, or disease:
> (1) Is a danger to himself or to others; or
> (2) Lacks the mental capacity to contract or manage his own affairs.
>
> (b) The term shall include—
> (1) A finding of insanity by a court in a criminal case; and
> (2) Those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility pursuant to articles 50a and 72b of the Uniform Code of Military Justice, 10 U.S.C. 850a, 876b.

27 C.F.R. § 478.11. "Committed to a mental institution" is defined in this way:

> A formal commitment of a person to a mental institution by a court, board, commission, or other lawful authority. The term includes a commitment to a mental institution involuntarily. The term includes commitment for mental defectiveness or mental illness. It also includes commitments for other reasons, such as for drug use. The term does not include a person in a mental institution for observation or a voluntary admission to a mental institution.

*Id.* While federal law controls defining these phrases, courts also consider state law classifications and procedures when determining whether § 922(g)(4) applies. *See Shepherd v. Garland*, No. 5:20-CV-258, 2022 WL 985867, at *4 (N.D.W. Va. Mar. 31, 2022); *see also United States v. Vertz*, 40 F. App'x 69, 73 (6th Cir. 2002) ("[F]ederal courts often look to state law to help determine whether a commitment has occurred.").

When the interpretation of a statute is at issue, this Court first looks to the text of the statute. Terms are given their plain meaning, and if the construction of such is clear—the inquiry stops there. *United States v. Jackson*, 635 F.3d 205, 209 (6th Cir. 2011) (citing *United States v. Choice*, 201 F.3d 837, 840 (6th Cir. 2000)). "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 351 (1997). A court must avoid construing a statue, if possible, in a way that makes it unconstitutional or construing it in a way that raises doubts regarding its constitutionality. *Almendarez–Torres v. United States*, 523 U.S. 224, 237–38 (1998).

Mach argues that he does not fall within the prohibited class in § 922(g)(4) and that the government erred when it denied his request to purchase a firearm for self-defense. [Record Nos. 8 and 14] The defendants contend, however, that Mach was "adjudicated as a mental defective" and "committed to a mental institution" within the meaning of § 922(g)(4) when he was subjected to involuntary hospitalization under W.V. Code § 27-5-3. [Record Nos. 12 and 18] Starting with the plain text of the statue, and considering the definitions provided in 27 C.F.R. § 478.11, the word "adjudicated" denotes an adversarial proceeding before an impartial arbiter with some form of process. The issue here is that Mach was not contesting his in-patient placement at Highlands Hospital—in fact, he sought it out. This is further supported

by the licensed psychologist being the only person to testify at the hearing. Mach was not present nor contacted by his appointed counsel. [Record No. 8 at ¶ 47]

Additionally, the remainder of the definition in 27 C.F.R. § 478.11 for "adjudicated as a mental defective" states that "The term shall include—(1) A finding of insanity by a court in a criminal case; and (2) Those persons found incompetent to stand trial or found not guilty by reason of lack of mental responsibility." Both examples in that section require a heightened showing, suggesting that the burden of proof in such a determination is relevant. Here the burden of proof was only probable cause, further undercutting the defendants' argument that Mach was "adjudicated as a mental defective" under § 922(g)(4).

The definition of "[c]ommitted to a mental institution" in 27 C.F.R. § 478.11 specifies that it is a "*formal* commitment." (Emphasis added). The definition also excludes "a person in a mental institution for observation or a voluntary admission to a mental institution." Taken together, this suggests that one could be informally committed, in a mental institution for observation, and voluntarily admitted to a mental institution and still not be "committed to a mental institution" as contemplated by § 922(g)(4). Here, Mach was amenable to placement in an in-patient facility, but no voluntary beds were available. He was not subjected to formal commitment procedures, available under W.V. Code § 27-5-4, because his case was dismissed a few months later. After about a week, he was discharged from Highlands Hospital, suggesting he was present for evaluation and not committed as the defendants argue.

Federal definitions aside, in 2020 the West Virginia legislature amended § 27-5-2a (outlining the process of involuntary hospitalization) to clarify "(g) An action taken against an individual pursuant to this section may not be construed to be an adjudication of the individual, nor shall any action taken pursuant to this section be construed to satisfy the requirements of

§61-7-7(a)(4) of this code." *Shepherd*, 2022 WL 985867, at *5. Section 61-7-7(a)(4) is entitled "[p]ersons prohibited from possessing firearms; classifications; right of nonprohibited persons over twenty-one years of age to carry concealed deadly weapons; offenses and penalties; reinstatement of rights to possess; offenses; penalties." While the revision to the statute occurred after Mach's involuntary hospitalization hearing and not retroactive, it provides an important understanding of the commitment process enumerated by the West Virginia Code. *See Shepherd*, 2022 WL 985867, at *4–*5 (noting the amendment's relevance to finding that the plaintiff's classification in § 922(g)(4) was in error). In summary, looking to federal definitions of § 922(g)(4) and West Virginia law, Mach's claim that he was erroneously denied a firearm is sufficiently pled.

### Second and Fifth Amendment

In analyzing an as applied Second Amendment violation, following *Bruen*, the Court first considers whether "'the Second Amendment's plain text'" covers the individual's conduct. *United States v. Williams*, 113 F.4th 637, 661 (6th Cir. 2024) (quoting *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022)). If the answer is yes, "then the Constitution presumptively protects it." *Williams*, 113 F.4th at 661 (citation omitted). The government bears the burden to justify regulating the conduct at issue by showing it "'is consistent with the Nation's historical tradition of firearm regulation.'" *Id.*; *see also Rahimi*, 602 U.S. 680 at 691. This can be done by comparing historical regulations to modern analogues, but past regulations need not be a historical "'twin'" or "'dead ringer.'" *Williams*, 113 F.4th at 661 (citation omitted). Rather, they must be "'relevantly similar' to laws that our tradition has historically embraced." *Id.* Courts also must consider "'how and why [historical]

regulations burden a law-abiding citizen's right to armed self-defense,' and determine whether the challenged regulation is comparably justified." *Id.*

Procedural due process concerns are implicated when the government places individuals into classes that are prohibited from purchasing or possessing firearms. The United States Court of Appeals for the Sixth Circuit, sitting *en banc* has expressed concern regarding due process holes in the existing statutory framework for those banned under 18 U.S.C. § 922(g)(4), at least in the absence of a safety valve restoration procedure like the one found in 18 U.S.C. § 925(c) which functionally remains unavailable due to a lack of funding in Congressional appropriations bills for the program. *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 694 (6th Cir. 2016) (en banc); *see also Williams*, 113 F.4th at 661 (noting the longstanding functional unavailability of relief under § 925(c) due to it being unfunded).

The Sixth Circuit pointed out that 18 U.S.C. §922(g)(4) "does not use the phrase 'mentally ill,' nor does it attempt to prohibit all currently mentally ill persons from firearm possession." *Tyler*, 837 F.3d at 687 (en banc). Instead, it "uses prior judicial adjudications—incompetency and involuntary commitment—as proxies for mental illness." *Id.* (citing *United States v. Rehlander*, 666 F.3d 45, 50 (1st Cir. 2012)). But "[p]rior involuntary commitment is not coextensive with current mental illness." *Tyler*, 837 F.3d at 687–88 (en banc) (explaining that Congress recognized this "when it enacted the NICS Improvement Amendments Act, thereby allowing states to restore the right to possess a gun to persons previously committed").

Identifying nineteen states with no process for restoration of gun rights, the Sixth Circuit noted that the practical effect resulted in a permanent ban under Section 922(g)(4). *Id.* at 694. *Tyler*, however, did not settle how much process is due, but "without an adversary adjudication of the need for mental health commitment, there are serious due process

questions." *United States v. McMichael*, 350 F. Supp. 3d 647, 659 (W.D. Mich. 2018) (citing *Tyler*, 837 F.3d at 681–82).

Even after *Bruen* and *Rahimi*, those placed in firearm-prohibited classes must be given an opportunity to show they never did or no longer belong in that class. The government may use "class-based legislation to disarm people it believes are dangerous" if "members of that class have an opportunity to show" they are not dangerous. *Williams*, 113 F.4th at 661–62; *see generally Tyler*, 837 F.3d at 678 (en banc) (espousing that same line of reasoning in the context of § 922(g)(4)).

In the present case, Mach seeks a firearm to use in his home for self-defense, which falls within the Second Amendment's plain text. Therefore, the Constitution presumptively protects his ability to do so. As for a historical analogue, the defendants concede that there were "'no clear sets of positive-law statutes concerning mental illness and firearms from the Founding.'" [Record No. 18 at 6] (quoting *United States v. Connelly*, 117 F.4th 269, 275 (5th Cir. 2024)). Instead, they argue that the government instituted an even greater deprivation of liberty than disarmament because it could imprison those who were "'so mentally ill that [they] presented a danger to themselves or others." [Record No. 18 at 6] (quoting *Connelly*, 117 F.4th at 275). Danger remains relevant to this analysis because "colonial America long disarmed groups that they deemed to be dangerous." *Williams*, 113 F.4th at 657.

While the defendants' historical tradition analysis could suffice for a *facial* challenge to § 922(g)(4), it does not suffice for the *as applied* challenge Mach presents. *See id.* at 663 (explaining, in the context of felons and dangerousness, that courts "should make fact-specific dangerousness determinations after taking account of the unique circumstances of the individual, including details of his specific conviction" when resolving as applied challenges).

The issue Mach raises is whether *his* placement (and continued placement) in the prohibited class violates *his* constitutional rights. The defendants must instead justify regulating Mach's conduct at issue to show such regulation is consistent with the traditions of firearm regulations in this country. That, they fail to do.

The conduct at issue, as alleged, includes: (1) Mach experienced an acute mental health crisis for which he sought medical intervention; (2) he entered Highlands Hospital on his own volition and was not committed; (3) the probable cause proceedings were not adjudications because they were not adversarial and failed to satisfy due process; (3) for the last seven years, he has had no mental health concerns or suicide attempts; and (4) after being denied from purchasing a firearm to use in his home for self-defense, he had no opportunity to show his designation in the prohibited class was in error because the DOJ provided no reasons for his denial, refused to amend its record, and purged the record of his denial.

The Sixth Circuit has yet to squarely confront § 922(g)(4) since *Bruen*. However, much of the analysis in *Tyler* regarding the sometimes-temporal nature of mental crises remains relevant. Thirty years before attempting to purchase a firearm, Tyler was involuntarily committed following his "wife of twenty-three years [running] away with another man," depleting his finances, and serving him divorce papers. *Tyler*, 837 F.3d at 683 (en banc). His daughters became concerned by Tyler's mounting emotional instability and feared he might be a danger to himself. As a result, they contacted local police who initiated a psychological evaluation. *Id.* That process culminated into Tyler being brought, with counsel, before a probate court which found by clear and convincing evidence that he was mentally ill and posed a threat to himself and others. *Id.* He was committed for two to four weeks before being released. *Id.* In the three decades after that discharge, Tyler remarried, was gainfully

employed, experienced no other depressive episodes, and repaired his relationship with his ex-wife. *Id.* at 683–84.

The Sixth Circuit never reached the merits of Tyler's constitutional claims because it reversed and remanded the district court's dismissal. However, it found that Tyler had "a viable claim under the Second Amendment and that the government [had] not justified a lifetime ban on gun possession by anyone who [had] been 'adjudicated as a mental defective' or 'committed to a mental institution,' 18 U.S.C. § 922(g)(4)." *Id.* at 699. While the en banc court applied the pre-*Bruen* test to render its finding on the lifetime ban, as Mach notes, Judge Batchelder's concurrence engaged with historical tradition regarding those deemed mentally ill. *Id.* at 702–14 (Batchelder, J., concurring in part). She noted that whether a person had lost the ability to reason was an important consideration in designating that person insane. *Id.* at 704–05 (citation omitted). And while a court could confine and disarm those who had dangerous mental impairments, it could only do so after a "valid judgment from a civil tribunal." *Id.* at 706 (citation and quotation omitted). Such a valid judgment allows for the deprivation of one's liberty and ability to control one's property. *Id.* Judge Batchelder further explained that the law contemplated that reason may be regained and that a person could regain his or her right to liberty and his or her ability to control property. *Id.*

The inability to challenge one's continued placement in § 922(g)(4) concerned the *Tyler* court. And the post-*Bruen* panel in *Williams* appeared to affirm this stance when it qualified the government's use of "class-based legislation to disarm people it believes are dangerous" with the requirement that "members of that class have an opportunity to show" they are not dangerous. *Williams*, 113 F.4th at 661–62. Further, the panel in *Williams* reiterated that 18 U.S.C. § 925(c)'s relief-from-disabilities program remains unfunded rendering it useless. *Id.*

- 12 -

at 661. Here, Mach has sufficiently pled that he has not been given an opportunity to contest his placement in the prohibited class.

The defendants give short shrift to Mach's due process claim regarding his NICS firearm denial. [*See* Record No. 18 at 8–9.] In passing (and broached for the first time in their Reply) they argue that Mach ignores the other potential remedies available to him: "28 CFR 25.10 'Correction of erroneous system information'; 18 U.S.C. § 925A 'Remedy for erroneous denial of firearm'; W. Va. Code § 61-7-7(f); W. Va. Code § 61-7A-5." *Id.* However, Mach *does* allege that he sought correction pursuant to 28 CFR 25.10. [Record No. 8 at ¶ 28] Regarding the West Virginia statutes, W. Va. Code § 61-7-7(f) allows a person to "petition the circuit court of the county in which he or she resides to regain the ability to possess a firearm," but Mach does not live in West Virginia, and so it is unclear whether he may use this particular remedy. [Record No. 8 at ¶ 1] The second statue, W. Va. Code § 61-7A-5, does not apply because it is only for those who were "adjudicated to be mentally defective or to having a prior involuntary commitment to a mental institution pursuant to §27-5-4(l)," but Mach was involuntarily hospitalized pursuant to W.V. Code § 27-5-3. [Record No. 8 at ¶ 12]

Mach challenges NICS's use of the West Virginia proceedings as a proxy for his alleged mental illness (and placement in § 922(g)(4)) because those proceedings did not comply with due process. [Record No. 8 at ¶¶ 46–47] The defendants offer little to show Mach failed to state a due process violation for the involuntary hospitalization procedures in West Virginia. [*See* Record No. 18 at 8.] Mach alleges that he received no advance notice, opportunity to prepare a defense, access to discovery, ability to consult with appointed counsel, and ability to be present at the hearing. [Record No. 8 at ¶ 47] Further he contends that the probable cause standard at the hearing was too low to deprive him of his Second Amendment rights. *Id.* at ¶

12. Contrary to the defendants' contention that he does no more than offer "conclusory allegations," Mach states a procedural due process claim for the West Wirginia proceedings—to the extent that they were the basis for NICS's firearm denial.

### Privacy Act

The Privacy Act applies to records maintained on individuals by agencies, and its purpose is to protect the public from "'unwarranted collection, maintenance, use and dissemination of personal information contained in agency records . . . by allowing an individual to participate in ensuring that his records are accurate and properly used.'" *Barouch v. U.S. Dep't of Just.*, 962 F. Supp. 2d 30, 66 (D.D.C. 2013) (quoting *McCready v. Nicholson*, 465 F.3d 1, 7–8 (D.C. Cir. 2006)). The Act allows for a private right of action for those aggrieved by an agency's violation of the Act's provisions. 5 U.S.C.A. § 552a(g).

### Subsections 552a(d)(3)–(4)

Subsections 552a(d)(3)–(4) of Chapter 5 of the United States Code outline the process after an individual has made a proper demand that the agency amend its record. Once the agency refuses to amend its record, the aggrieved may request a review of that refusal pursuant to § 552a(d)(3). If the agency reviews its refusal but does not change its position, the aggrieved party may file "a concise statement setting forth the reasons for his disagreement with the refusal of the agency" and then seek judicial review. 5 U.S.C.A. § 552a(d)(3) (West).

Portions of the contested record and a "concise statement of the reasons of the agency for not making the amendments requested" may be provided to "other agencies to whom the disputed record has been disclosed." *Id.* at § 552a(d)(4). Such allegations of an agency's refusal to amend a record pursuant to § 552a(d)(3) are not intended to be used to challenge agency decisions but are "intended solely to be used to correct factual or historical errors."

- 14 -

*Milhous v. Equal Emp. Opportunity Comm'n*, 145 F.3d 1332, *1 (6th Cir. 1998) (citing *Pellerin v. Veterans Admin.*, 790 F.2d 1553, 1555 (11th Cir. 1986)). The remedy only allows for injunctive relief. *See* §§ 522a(g)(1)(A), (2)(A) (showing the remedy for violating subsection (d)(3) is the court ordering the agency to amend its record).

Mach's Privacy Act claims fail under these subsections for two reasons. First, he fails to state a claim under § 552a(d)(3) that the agency maintained records on him that contained "factual or historical errors." *Milhous*, 145 F.3d at *1 (citing *Pellerin*, 790 F.2d at 1555). Instead, he appears to challenge the agency's alleged misguided interpretation of his mental health records to determine that he falls into the prohibited class under §922(g)(4). [*See* Record Nos. 8 at ¶¶ 33–34 and 14 at 14.] But such agency decisions may not be challenged by way of the Privacy Act. *Milhous*, 145 F.3d at *1.

Second, his Amended Complaint offers inadequate information demonstrating that he exhausted the administrative remedies in § 552a(d). Indeed, this failure to exhaust is a "jurisdictional deficiency because exhaustion is required by statute." *Barouch*, 962 F. Supp. 2d at 67 (citing 5 U.S.C.A. § 552a(d)(1)–(3), (g)(1)(B)). While Mach alleges that he sought correction of his records when he filed his second appeal of the NICS denial, there is no indication he took any additional steps under the Act. [*See* Record No. 8 at ¶ 31.] Specifically, § 552a(d)(3) allows an individual, who disagrees with the agency's refusal to "amend his record to *request a review of such refusal*," but Mach does not show that he ever requested that the agency review its refusal. (Emphasis added).; [*See* Record No. 8.] The same is true for the provision in § 552a(d)(3), which requires the aggrieved to file a statement of disagreement because Mach does not indicate that he filed a statement of disagreement. *See id.* This same

statement is required to trigger § 552a(d)(4). Therefore, Mach does not have a claim under either subsection of the Act because he failed to exhaust his remedies.

### Subsections 552a(e)(1)–(2), (5)–(6), (8)

These portions outline the expectations of agencies to comply with the Act. Section 552a(g)(1)(D) provides a catchall for agency failures to comply with any other provision of the Act, "in such a way as to have an adverse effect on an individual" and allows that individual to bring a civil action against the agency. However, Mach merely parrots the statute, fails to provide sufficient allegations pertaining to the agency's lack of compliance, and offers no connection regarding its adverse effect on him. [*See* Record No. 8 ¶¶ 57–61.] This argument is foreclosed for the same reasons outlined above regarding § 552a(d)(3) to the extent that he alleges a violation of § 552a(e)(5), indicating that the agency failed to maintain his mental health records.

### Section 552a(g)(1)(C)

An individual bringing a claim under § 552a(g)(1)(C), for failure to maintain any record must demonstrate that (1) he or she "has been aggrieved by an adverse determination"; (2) "the agency failed to maintain [his or her] records with the degree of accuracy necessary to assure fairness in the determination"; and (3) "the agency's reliance on inaccurate records was the proximate cause of the adverse determination." *Kursar v. Transportation Sec. Admin.*, 581 F. Supp. 2d 7, 19 (D.D.C. 2008), *aff'd*, 442 F. App'x 565 (D.C. Cir. 2011) (quoting *McCready*, 465 F.3d at 10). "Where an aggrieved person can identify a specific document, prove its inaccuracy, and demonstrate that the document was used against her, all the values of the [Privacy] Act are vindicated." *McCready*, 465 F.3d at 12. Injunctive relief is not available for

claims brought under § 552a(g)(1)(C). *Kursar*, 581 F. Supp. 2d at 19 (citing *Doe v. Chao*, 540 U.S. 614, 635 (2004) (Ginsburg, J., dissenting on other grounds)).

If the Court determines that the "agency acted in a manner which was intentional or willful, the United States shall be liable to the individual in an amount equal to the sum of— (A) actual damages sustained by the individual . . . but in no case shall a person entitled to recovery receive less than the sum of $1,000; and (B) the costs of the action together with reasonable attorney fees." 5 U.S.C.A. § 552a(g)(4) (West). Sixth Circuit precedent defines "willful" and "intentional" as "'somewhat greater than gross negligence—either by committing the act without grounds for believing it to be lawful, or flagrantly disregarding others' rights under the [Privacy] Act.'" *Shearson v. Holder*, 865 F. Supp. 2d 850, *870 (N.D. Ohio 2011), *aff'd*, 725 F.3d 588 (6th Cir. 2013) (addition in original) (quoting *Beaven v. United States Dep't of Justice*, 622 F.3d 540, 549 (6th Cir. 2010)). Such a standard is high, imputing "'civil liability only for those lapses which constituted an extraordinary departure from standards of reasonable conduct.'" *Shearson*, 865 F. Supp. 2d at *870 (quoting *Kostyu v. United States*, 742 F. Supp. 413, 417 (E.D. Mich. 1990)).

Mach fails to allege that any specific document was inaccurate. Rather, he makes vague references in his Amended Complaint to erroneous records and information. [*See* Record No. 8 at ¶¶ 33–36.] But even if he showed that the agency failed to maintain his records—with the degree of accuracy necessary to assure fairness in the determination of his ability to receive a firearm—his claim still fails because he does not allege agency actions sufficient to meet the "willful or intentional" standard for damages and injunctive relief is not available. *See* 5 U.S.C.A. § 552a(g)(4) (West); *see also Kursar*, 581 F. Supp. 2d at 19 (citing *Chao*, 540 U.S. at 635 (Ginsburg, J., dissenting on other grounds)).

Mach does allege in his Amended Complaint "misfeasance and malfeasance" of the defendants resulting in "multiple records within the state law enforcement systems and NICS remain[ing] erroneous and false." [Record No. 8 at ¶ 36]  But this assertion not only fails to rise to the level of "willful or intentional", it also fails because such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" cannot survive a motion to dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### IV.  Conclusion

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** that Defendants Merrick Garland, Christopher Wray, Steven Dettelbach, and the United States' Joint Motion to Dismiss [Record No. 12] is **DENIED** as to the alleged illegal firearm denial (Count I) and as applied challenges under the Second and Fifth Amendments (Count II) but **GRANTED** as to the alleged Privacy Act violations (Count III).

The Clerk is directed to file this Memorandum Opinion and Order under seal because it discusses past mental health issues concerning the plaintiff.

Dated: January 10, 2025.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky